## IN RE BARRE WATER COMPANY.

*Eminent domain. Construction of charter. Taking property for private purposes.*

1. A water company, under a charter granting it the right to take private waters "for the extinguishment of fires, and for domestic, sanitary and other purposes," cannot use the water of a private stream for private manufacturing purposes as against the objection of mill owners upon such stream, who are injured thereby.

2. The words "other purposes" must be construed to mean other *public* purposes of the same character.

3. Private property cannot be taken by virtue of the right of eminent domain for private purposes.

This case was heard upon the report of commissioners at the September Term, Washington County, 1888, TYLER, J., presiding.

The charter of the Barre Water Company provides that in case that company deemed it necessary in the construction of its works to enter upon private lands or appropriate private waters, commissioners should be appointed to appraise the damages, who should return their report to the County Court for judgment thereon.

The company proposes to erect its dam and draw water from a certain point on the Jail Branch, and the exceptants are the owners of mill privileges on that stream, below such point.

The commissioners assessed the damages at a certain sum if the water was used only for the extinguishment of fires and for sanitary and domestic purposes, and at a larger sum if used for all purposes. The court gave judgment for the larger sum, to which the exceptants excepted, for that the company had no right to use the water for all purposes, but only for the purposes contemplated in awarding the smaller sum.

*E. W. Bisbee* and *S. C. Shurtleff*, for the Water Company.

In Re Barre Water Company.

The commissioners have found that the necessity exists for taking water through a pipe of the size put down to carry out the purposes specified in the charter. Hence there is no constitutional objection to the taking. Con. of Vt., Art. 2; *Mc Culloch* v. *Maryland*, 4 Wheat. 216.

Having been once taken, it may be used for any lawful purpose. *State* v. *Eau Claire*, 40 Wis. 533 ; *Canal Co.* v. *Water Power Co.*, 35 N. W. Rep. 529 ; *Bell* v. *Plattsville*, 36 N. W. Rep. 831 ; *Lucia* v. *Montpelier*, 60 Vt. 537 ; *Ipswich Mills* v. *County Com.*, 108 Mass. 363.

*Geo. W. Wing*, for the exceptants.

The Water Company has no right to use this water for private purposes. *Tyler* v. *Beacher et al.*, 44 Vt. 648 ; 5 Paige Ch. 137 ; 9 *ib.* 547 ; Gould Waters, s. 241 and cases cited.

The opinion of the court was delivered by

ROWELL, J. The Barre Water Company is incorporated by special charter, "for. the purpose of furnishing the town of Barre and the inhabitants thereof with water for the extinguishment of fires, and for domestic, sanitary, and other purposes." St. 1886, No. 171. For these purposes it is authorized to take, by purchase or otherwise, the water from Jail Branch and other waters. The company proposes to dam that branch, about two miles above Barre village, and take water therefrom in a 16-inch main, to supply the village. A main of that size is fairly and reasonably necessary for protecting the village in case of a general conflagration, but for domestic and sanitary purposes, only a small part of the water that it will supply will be needed, and the company intends to use the surplus water for running small motors for light manufacturing, and to rent water for that purpose, and claims the right to do so. The exceptants own mills on the stream below the company's proposed dam, and claim that the company has no right, as against them, to use the surplus water as intended. And this is the question.

The company contends that as at times it may be necessary for fire purposes to use all the water that a 16-inch main will supply, it has a right to take that amount at any time, and when not needed for the purposes specified in its charter, to use it for its own benefit for any other lawful purpose; that the words of its charter are general, and that the words, "other purposes," must be construed to mean any lawful purposes other than those specified; and that, by reason of the high pressure in the pipes, the water would be worth much more for running motors than for supplying power in the exceptants' dams.

Statutes are to be construed according to the intention of the Legislature, and the presumption is that the Legislature does not intend to do that which it has no authority to do; and as it has no authority to take private property for private use without the consent of the owner, the presumption is that it did not intend to authorize that to be done in this case, unless the contrary unmistakably appears, supposing, for the present, that the construction contended for would amount to such an attempted authorization.

It is said in *Farnsworth* v. *Goodhue*, 48 Vt. 209, in reference to statutes incorporating aqueduct companies, that they are "strongly derogatory to common right, and no case can be brought within them, except such as comes within their terms with imperative necessity." It is our duty to adopt that construction of the statute in question that will, without doing violence to the fair meaning of its language, harmonize it with the Constitution; therefore, the general words under consideration should not be so construed as to carry the grant of the statute beyond the legislative power, and thereby render the act unconstitutional to that extent, unless such a construction is imperatively necessary. *Grenada County Supervisors* v. *Brogden*, 112 U. S. 261. But we do not regard such a construction necessary, and think that on well-settled principles of very general application it would be erroneous.

It is a maxim of greater or less universality of application, both in the construction of written instruments and of statutes, that gen-

eral words may be aptly restricted according to the persons or the subject-matter to which they relate. Lord Hale's maxim of *noscitur a sociis* is akin to this, from which the rule is deduced, that the meaning of a word may be ascertained by reference to the meaning of words associated with it. And it is laid down by Lord Bacon that the coupling of words together shows that they are to be used in the same sense. In the Archbishop of Canterbury's Case, 2 Co. 46a, it is said that when an act of parliament begins with words that describe persons or things of an inferior degree and concludes with general words, the general words shall not be extended to persons or things of a higher degree. So it is a general rule of construction that when a particular class of persons or things is spoken of, and general words follow, the class first mentioned is to be taken as the most comprehensive, and the general words treated as referring to matters *ejusdem generis* with such class. Thus, the words, "boat, barge, or other vessel," in an act of parliament, have been held not to include ships, as ships are vessels not *ejusdem generis* with boats and barges. Per Pollock, C. B., in *Lyndon* v. *Stanbridge*, 2 H. & N. 45. An act of parliament imposed certain duties on copper, brass, pewter, tin, and "all other metals not enumerated," and it was held that the latter words did not include gold and silver. *Casher* v. *Holmes*, 2 B. & Ad. 592. And see *Evans* v. *Stevens*, 4 T. R. 224; Broom's Leg. Max. (*651); Sedgw. Const. Stat. Law, 360, n. (a), and 361.

Now, applying this rule to the case before us, to which it is manifestly applicable, the words, "other purposes," must be construed to refer to purposes *ejusdem generis* with the purposes specially mentioned, and to mean other *like* purposes, or other like *public* purposes. This makes the statute constitutional in all respects, and raises the question whether the intended use of the water for running small motors for light manufacturing, and the renting of it for that purpose, is a *public* use within the meaning of the Constitution.

The theory of the right of eminent domain is, that all lands are held mediately or immediately from the State, upon the

implied condition that the eminent domain, the superior domin-
ion, remains in the State, authorizing it to take the same for
public uses when necessity requires it, by paying therefor an
equivalent in money. The exercise of this right has been called
a "compulsory purchase," and in this aspect is much like the
ancient prerogative of purveyance, which at one time prevailed
pretty generally throughout Europe, and was regulated in Eng-
land by *Magna Charta*, but is now abolished there, whereby
the crown enjoyed the right of buying up provisions and other
necessaries for the use of the royal household at an appraised val-
uation and in preference to all others, even without the consent
of the owner.

But this theory does not embody the idea of an implied condi-
tion authorizing the State to take private property for *private*
uses, without the consent of the owner, even by paying an
equivalent in money; and the Constitution, by declaring only
that private property ought to be subservient to public uses when
necessity requires it, by implication declares that it ought not to
be subservient to any other uses without the consent of the
owner; for here the maxim is justly applicable, that the express
mention of one thing implies the exclusion of another.

But to say what a public use is with sufficient comprehensive-
ness and accuracy to meet the exigencies of all cases is, to say
the least, difficult. Nor is it easier to define the limit of leg-
islative power in respect of the right of eminent domain. This
power must have some degree of elasticity, that it may be exer-
cised to meet the demands of new conditions and improvements,
and the ever-varying and constantly-increasing necessities of an
advancing civilization. The circumstances and requirements of
the particular case and the practice of other States and govern-
ments where constitutional limitation is placed on legislative
action in this respect, must be our guides in determining what is
and what is not a public use.

It is sometimes easier to say what is *not* than to say what *is*.
It is so in this case. To say that this proposed use is *not* a pub-
lic use, is easy. It has none of the elements of a public use. To

In Re Barre Water Company.

enter upon an extended discussion of the subject is unnecessary, for this court has laid down the law of it fully and clearly in *Tyler* v. *Beacher*, 44 Vt. 648, in which the Flowage Acts were held unconstitutional. That was an attempt to flow the defendants' land for the benefit of the plaintiff's grist-mill, which was found to be "an undoubted public benefit." But because the mill was private property, and there was no law to compel the plaintiff and his successors to grind for the public nor any part of it, but they were free to do as they pleased about it, and because the public benefit found by the commissioners appertained to the plaintiff in his private business instead of to the defendants in theirs, and could not accrue from any use the public would have of the flowage or of the mill, but only from the use the plaintiff and his successors might make of it; and because said benefit, such as it was, was not in any way *secured* to the public, either by legislative enactment or the proceedings in the case; and because the attempt was, not to take the property of the defendants for the grist-mill as long as plaintiff and his successors should maintain and operate it, but to take the right forever, without limitation, express or implied, except that probably the use would be limited to the purposes for which the taking could be had under the acts; the court said the attempt was to take the property of the defendants for the use of the plaintiff and not for the use of the public.

Tested by that case, it is entirely clear that the use here proposed is not a public use, but the merest private use. Nor is the case so strong as that in its facts, for here is no finding of a public benefit. But it is said that by reason of the high pressure in the pipes the water would be worth much more for running motors than for supplying power in the exceptants' dams. But that makes no difference. One man cannot have another's property simply because it would be worth more in his hands.

It is further said that the sewers of the village need daily cleaning, and that the water used for running motors would be discharged into them and clean them, and so be ultimately devoted to a public use. But it does not appear that the sewers

need daily or frequent cleaning, nor that the water would be discharged into them, nor that it would be of sufficient quantity to clean them to any beneficial extent if it was. . This is a sufficient answer to that claim, without inquiring whether such an incidental and permissive use, though public, would warrant the taking when the primary and principal use is private, to the support of which proposition the case of *Lucia* v. *The Village of Montpelier*, 60 Vt. 537, is cited. But that case is not like this. There the village owned the water, which was more than it needed for public uses, and the surplus was running to waste; and the question was whether the village could lawfully, as against taxpayers, lay an additional main for the primary purpose of rendering the water supply more certain in case of injury to the original main, and more ample in case of extraordinary fire; and it was held that it could, seeing that it had charter authority to supply itself with water for fire and domestic purposes, and was not limited in respect of expenditure nor supply, but was left to exercise its judgment and discretion in the matter, which, for aught that appeared, had been exercised in good faith.

*Judgment reversed, and judgments for the exceptants for the smaller sums, etc.*