2008 VT 64

**Harley Grice, Individually and as Trustee of the Harley Grice Trust, Wendy Butler, Penny Curler and Heather Grice v. Vermont Electric Power Company, Inc.**

**In re Petition of Vermont Electric Power Company, Inc.**

[956 A.2d 561]

Nos. 06-352 & 06-510

Present: **Reiber, C.J., Skoglund and Burgess, JJ., and Eaton, D.J., and Gibson J. (Ret.), Specially Assigned**

Opinion Filed May 16, 2008

*James A. Dumont* of *Law Office of James A. Dumont, PC*, Bristol, for Appellants Grice, et al. (06-352 & 06-510).

*Kimberly K. Hayden* of *Downs Rachlin Martin PLLC*, St. Johnsbury, and *Joslyn L. Wilschek* of *Primmer Piper Eggleston & Cramer PC*, Montpelier, for Appellees/Cross-Appellants Vermont Electric Power Company, Inc. and Vermont Transco, LLC (06-352 & 06-510).

*James H. Porter, III*, Montpelier, for Appellee Department of Public Service (06-510).

*William H. Sorrell*, Attorney General, and *Bridget C. Asay*, Assistant Attorney General, Montpelier, for Intervenor State of Vermont, Office of the Attorney General (06-352 & 06-510).

*David L. Grayck* and *Evan J. Mulholland* of *Cheney, Brock & Saudek, P.C.*, Montpelier, for Amicus Curiae The Meach Cove Real Estate Trust (06-510).

¶ 1. **Reiber, C.J.** These two related appeals involve a petition by the Vermont Electric Power Company (VELCO) to condemn an easement for an electrical-transmission line across the property of landowners, Harley Grice, individually and as trustee of the Harley Grice Trust, Wendy Butler, Penny Curler and Heather Grice (the Grices). The Public Service Board granted VELCO's petition to condemn a strip of the Grice property, but denied VELCO's request to install excess fiber-optic capacity along the corridor. Concurrent to the Board proceedings, the Grices filed a declaratory action in superior court challenging the Board's statutory and constitutional authority to condemn their property. The court concluded that the Board had constitutional and statutory authority. The Grices appeal both the Board's condemnation order and the superior court's judgment. VELCO cross-appeals from the Board's order denying its request to add excess fiber-optic capacity to its transmission line. We affirm the superior court decision and the Board's condemnation order, but amend the Board's order to allow VELCO to install the requested fiber-optic capacity.

¶ 2. The procedural history and facts of the case are briefly as follows. VELCO initiated a plan to increase the capacity of the electrical grid in Vermont by installing along a thirty-five-mile corridor a 345 kilovolt (kV) electrical line as part of the Northwest Reliability Project (NRP). VELCO petitioned the Board for a certificate of public good (CPG), and in January 2005 the Board concluded that the NRP was necessary for the reliability of the electrical system in Vermont and issued a CPG. See 30 V.S.A. § 248(a) (requiring an electric company to obtain approval from the Board that a project "will promote the general good" before beginning to construct a new transmission facility). Several parties challenged the Board's decision to grant a CPG, and, on appeal, this Court affirmed. *In re Vt. Elec. Power Co.*, 2006 VT 69, 179 Vt. 370, 895 A.2d 226.

¶ 3. Following the Board's issuance of the CPG, VELCO attempted to negotiate with the landowners along the proposed corridor, including the Grices, to obtain the necessary easements. VELCO already has a 150-foot-wide easement across the Grices' land where an 115kV electric line is installed. In September 2005, after VELCO failed to reach an agreement with the Grices, VELCO petitioned the Board to condemn a 100-foot-wide strip of the Grice property, about a mile in length that would run parallel to the existing lower-voltage easement. VELCO asked for permission to remove so-called "danger trees" outside of the easement and for access to the easement at all points in the case of an emergency. As part of its proposal, VELCO also planned to install an optical ground wire (OPGW) cable across the easement with seventy-two optical fibers to transmit data, and video and voice communication. VELCO explained that the OPGW cable would be used for internal communication and was necessary to insure reliability of the line, but acknowledged that it did not need all seventy-two fibers for internal communication. VELCO planned to trade any excess capacity to other communication service providers in return for use of their capacity in other parts of the state where VELCO does not have optical fibers and must pay for their use.

¶ 4. The hearing officer granted VELCO's request for condemnation, and for unlimited access to the easement. The officer concluded that it was necessary for VELCO to be able to reach the easement to remove trees or restore power in the case of an emergency. The hearing officer denied VELCO's request to install excess capacity in the OPGW, concluding that this was not necessary for VELCO's business of providing electrical services, and therefore VELCO could not condemn the property for such a purpose.

¶ 5. On appeal, the Board adopted the hearing officer's findings, affirmed the hearing officer's conclusion that the easement was necessary, and granted VELCO condemnation of the easement. The Board also granted VELCO unlimited access to the easement, concluding that it was necessary to maintain reliability of the line in emergency situations. The Board assessed damages for the Grices at $25,000. In response to VELCO's request to install excess capacity in the OPGW, the Board concluded that VELCO was not authorized to sell, lease or exchange excess capacity. In a subsequent order clarifying this conclusion, the Board specified

that VELCO was not authorized to install all seventy-two fibers because VELCO only needed twenty-four fibers to insure the reliability of the line. The Board reasoned that if VELCO could buy capacity from other providers in other parts of the state then it was not necessary to have excess capacity to trade.

¶ 6. While the Board action was pending, the Grices also filed an action for declaratory judgment in Addison Superior Court, challenging VELCO's statutory and constitutional authority to condemn their land in a proceeding before the Board. The Grices argued that the Board's assertion of jurisdiction violated its authorizing statute, was preempted by federal law and violated the Vermont Constitution because the energy running through the transmission lines would be regulated by federal, not state, law. The superior court dismissed the complaint, concluding that the condemnation action did not violate any statute or the Vermont Constitution, and was not preempted by federal law. The Grices appealed. The Grices also appealed the Board's decision, challenging the Board's authority to adjudicate the condemnation action. VELCO filed a cross-appeal, arguing that the Board erred in not granting it the right to install excess fiber-optic capacity along the easement. We consolidated the appeals from the Board and the superior court.

¶ 7. We review de novo the superior court's decision interpreting the statute and the Vermont Constitution. *Wright v. Bradley*, 2006 VT 100, ¶ 6, 180 Vt. 383, 910 A.2d 893. Our review of decisions from the Board is more deferential; we defer to the Board's "expertise and informed judgment," and "apply a strong presumption of validity" to its orders. *In re Verizon New England Inc.*, 173 Vt. 327, 334, 795 A.2d 1196, 1202 (2002). "Absent a compelling indication of error, we will not disturb an agency's interpretation of statutes within its particular area of expertise." *Id.* at 334-35, 795 A.2d at 1202. With these standards in mind, we turn to the issues on appeal.

I.

¶ 8. We first address the Grices' claims in their direct appeal. In three related claims, the Grices argue that the Board had no authority to grant VELCO's condemnation request because the condemnation action: (1) is contrary to the Board's statutory mandate, (2) is preempted by federal law, and (3) violates Article 2 of the Vermont Constitution. The Grices also contend that if the

Board did have authority to adjudicate the condemnation action, the Board erroneously granted VELCO overly broad access to the property. Finally, the Grices request attorney's fees and expert witness costs. We consider these claims in turn.

## A.

¶ 9. The Grices' main argument on appeal is that the resulting 345kV line will be regulated by federal law, not state law, and it is beyond the Board's authority to condemn property for a use that it will not regulate. In particular, the Grices argue that the Board does not have statutory authority to grant condemnation unless the Board will directly regulate the resulting use. In assessing the Grices' claim, we begin by examining the language of the Board's authorizing statute. See *In re Verizon New England*, 173 Vt. at 335, 795 A.2d at 1202 (explaining that to give effect to the Legislature's intent, we first examine the plain meaning of the statute). The statute authorizes the Board to adjudicate condemnation of private land when it is "necessary" for a public service corporation under the jurisdiction of the Board to acquire such property or an easement to the property "that it may render adequate service to the public in the conduct of its business." 30 V.S.A. § 110. Once a utility initiates a condemnation action, the Board may grant the request if the Board finds that it is

> necessary in order that the [utility] may render adequate service to the public in the conduct of the business which it is authorized to conduct, and in conducting which it will, according to the laws of this state, be under an obligation to serve the public on reasonable terms, and pursuant to the regulations of the board.

*Id.* § 112.

¶ 10. The Board made the required necessity determinations in this case. First, the Board generally concluded that the NRP is in the public interest and necessary for the reliability of the electrical system in Vermont when it granted VELCO a CPG for the project. *In re Vt. Elec. Power Co.*, 2006 VT 69, ¶ 21 (affirming Board's decision to grant a CPG); see *Auclair v. Vt. Elec. Power Co.*, 133 Vt. 22, 26, 329 A.2d 641, 644 (1974) (explaining that issuance of a CPG is "a resolution" that the project is in the public interest). In addition, as related to the Grice property, the

Board determined that an easement across the Grices' land is necessary for VELCO to complete the new line and provide adequate service to the public. See *In re Vt. Elec. Power Co.*, 2006 VT 69, ¶ 18 (explaining that § 248 certification is a planning and policy determination and does not predetermine the necessity of condemning particular parcels of land).

¶ 11. On appeal, the Grices do not challenge the Board's necessity determinations; rather, the Grices' arguments rest on the language in the latter part of § 112 that requires a petitioning company's business to be "according to the laws of this state, [and] be under an obligation to serve the public on reasonable terms, and pursuant to the regulations of the board." 30 V.S.A. § 112. The Grices interpret this requirement as authorizing the Board to adjudicate condemnation proceedings only in cases where the energy passing through the lines will be directly regulated by the Board. VELCO is an electrical-transmission company that transports power from other states into Vermont and sells it wholesale to the retail companies who in turn sell the power to individual consumers. Because VELCO's lines are part of an interconnected interstate grid, the power moving through them is regulated by federal law. The Grices reason that because the power from the new transmission line will not be regulated directly by the Board, but by federal regulations, the Board does not have authority to condemn their property.

¶ 12. We conclude that the Board properly exercised its authority to conduct condemnation proceedings in this case. The Board interpreted the statute's directive that a condemning company's business must be conducted "pursuant to the regulations of the board," 30 V.S.A. § 112, as follows: "The most reasonable construction of this requirement is not that the Board has actually adopted regulations that apply to a particular company, rather that the company, by law, is subject to such regulations as the Board may adopt." We agree with the Board's analysis, especially given our deference to the Board's interpretation of statutes within its area of expertise. See *In re Verizon New England*, 173 Vt. at 334-35, 795 A.2d at 1202 (deferring to the Board's interpretation of statutes within its area of expertise absent compelling indication of error). The statute does not require that the energy in the transmission lines be regulated by the Board, but that VELCO be subject to the Board's control and obligated to serve the public interest. An examination of the relevant statutes

indicates that both of these elements are met. VELCO is a public service corporation, obligated to serve the public and subject to the Board's oversight. See, e.g., 30 V.S.A. §§ 102 (establishing process for a company to become a public service corporation and providing that the Board can revoke the status for good cause), 209 (granting the Board jurisdiction over "all matters respecting" the business of a public service corporation). Moreover, the Board is empowered by statute to take action to insure the reliability of VELCO's transmission lines if it is in the interest of the people of Vermont. *Id.* §§ 210 (granting the Board jurisdiction to order electric companies to build or connect transmission lines if it is in the public good), 213 (empowering the Board to order an electrical-transmission company to transport electric energy over its transmission lines "at a reasonable service charge" and "in such manner as the board shall direct"). Thus, "in the conduct of [its] business," VELCO is "under an obligation to serve the public," and is subject to the Board's control. *Id.* § 112.

■ ¶ 13. The Grices' assertion that the statute is satisfied only if the Board directly regulates the energy passing through the lines is an overly narrow interpretation and at odds with the overall "reason and spirit" of the law. *Wright*, 2006 VT 100, ¶ 7 (quotation omitted) (explaining that in cases where the statute's plain meaning is not readily apparent, we examine the entire statute and look to the overall purpose of the law). The purpose of the statute is to insure that land is condemned for public use and remains subject to public control. In this case, there was previously a determination that construction of the new line is necessary for the public good, *In re Vt. Elec. Power Co.*, 2006 VT 69, ¶ 4, and, as indicated above, VELCO is obligated to serve the public pursuant to the Board's control. We find no merit in the Grices' proposition that VELCO's new transmission line will not benefit Vermonters because the line may carry electricity to other states. Even if the new transmission line carries electricity to other states at times of excess capacity over existing demand, the opposite is also true. The same transmission system of interconnected interstate lines will necessarily bring electricity to Vermonters at times of need, and in an emergency, the Board can require VELCO to do so. See 30 V.S.A. § 213.

¶ 14. Furthermore, the Grices' interpretation of the statutory language is at odds with the overall statutory scheme. Under the Grices' interpretation of the statute, the Board can entertain

condemnation actions only if it then actively regulates every aspect of the resulting use. If this is true, then at no time would the Board have jurisdiction to adjudicate condemnation actions for the wholesale transmission of energy because, as discussed below, this energy is regulated by federal law. The statute, however, envisions transmission companies, as well as energy retailers, using the power of eminent domain for the construction of transmission lines to the benefit of the public. See *id.* § 2802. As the Board explained, if transmission companies condemn property, "§ 2802 requires these companies to sell and furnish electricity to the extent that the Board determines that this would be required by 'the public convenience or necessity.' " We agree with the Board's interpretation of the statute and conclude that the statute authorizes condemnation in this case.

¶ 15. Next, we consider whether federal law preempts the Board's authority to adjudicate this condemnation action. Federal law can preempt state law pursuant to the Supremacy Clause, U.S. Const. art. VI, cl. 2. *In re Vt. Ry.*, 171 Vt. 496, 499-500, 769 A.2d 648, 652 (2000). State law may be preempted either explicitly by the language of a federal statute or implicitly by the federal statute's structure and purpose. *California ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 849 (9th Cir. 2004); *In re Verizon New England*, 173 Vt. at 336, 795 A.2d at 1203. A federal law implicitly preempts state law either by field preemption — if the legislation demonstrates Congress' intent to occupy an entire field, or through conflict preemption — where Congress has not entirely displaced state regulation in a particular field, but state law actually conflicts with federal law. *Dynegy*, 375 F.3d at 849; see *In re Verizon New England*, 173 Vt. at 336, 795 A.2d at 1203 (listing different types of preemption). Where the issue is not whether the federal government had authority to act, but whether state action conflicts with and has been displaced by federal law, there is a presumption that the power of the state is not superseded. *New York v. Fed. Energy Regulatory Comm'n*, 535 U.S. 1, 17-18 (2002). "The party seeking to overcome this presumption bears a heavy burden." *In re Vt. Ry.*, 171 Vt. at 500, 769 A.2d at 652.

¶ 16. The Grices argue both forms of implicit preemption and first submit that the Federal Energy Regulatory Commission (FERC) has exclusive jurisdiction in the area of electrical transmissions and thus federal law preempts state authority in the

entire field. The Grices claim that FERC's jurisdiction over interstate wholesale electric transmission is "plenary" and "exclusive." See *Dynegy*, 375 F.3d at 849-51. The opposite, however, is true because federal law regulating energy transmission does not occupy the entire field of energy regulation. As the Supreme Court of the United States concluded, FERC's authorizing statute and its own regulations have preserved state jurisdiction in several key areas pertaining to energy transmission. *New York*, 535 U.S. at 24. The Court recognized "Congress' intent to preserve state jurisdiction over local facilities." *Id.* at 22. Thus, we conclude that federal law has not wholly displaced state authority in the regulation of transmission of electrical energy, and examine whether any federal law conflicts with, and thus preempts, state regulation over VELCO's transmission lines.

¶ 17. The Grices also argue that FERC regulations requiring open access of transmission lines conflict with and therefore preempt state law. In 1996, FERC promulgated Order No. 888 entitled, "Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities." 61 Fed. Reg. 21,540 (May 10, 1996). The rule mandates that all public utilities, which own, control or operate facilities used for transmitting electric energy in interstate commerce, must file open-access nondiscriminatory transmission tariffs. VELCO is a provider of electricity transmission and, pursuant to these regulations, has already filed a tariff with FERC. Because FERC regulates the terms and conditions of the sale and transmission of wholesale energy in the 345kV line, the Grices argue that federal law preempts state control of VELCO's transmission.

¶ 18. The Board concluded that, notwithstanding federal control over rates for the sale of interstate-transmission services, open access to the VELCO transmission system and the reliability of interstate-transmission service, these elements of specific control did not conflict with the Board's responsibility under Vermont law to control electrical facility siting. We agree. Electricity in almost the entire continental United States is integrated in a grid system. Thus, no individual electrical provider or transmitter can guarantee that the electricity produced in its plant or transmitted across its lines will be directed to a particular consumer or group of consumers or be limited for distribution to a discrete geographic area. *New York*, 535 U.S. at 31-32 (Thomas, J., dissenting

and concurring). While we acknowledge federal authority to govern this interstate electrical-transmission grid, we conclude that Order No. 888 does not conflict with, but preserves, state jurisdiction over the power to exercise eminent domain to site transmission lines. FERC Order No. 888 states that it does not affect state authority "over local service issues, including reliability of local service." 61 Fed. Reg. at 21,626 n.544. The rule further explains that "Congress left to the States authority to regulate generation and transmission siting." Id. at 21,626 n.543. The electricity that moves across state lines is regulated by the federal government, but the transmission lines and their supporting structures remain in Vermont and are subject to state control. See 30 V.S.A. § 2(a)(7) (granting the Department of Public Service supervision over "[s]iting of electric generation and transmission facilities"). There is no conflict between VELCO's obligation under its FERC tariff to provide nondiscriminatory access for the free-flowing transmission of electricity across its transmission lines and the Board's authority to approve the necessity and siting of those lines. Thus, we conclude that federal law does not preempt the Board's exercise of jurisdiction in this case.

¶ 19. In a related argument, the Grices claim that condemnation of their land violates their rights under the Vermont Constitution. The Grices rely on Tyler v. Beacher, 44 Vt. 648 (1871), wherein a mill owner sought to build and operate a grist mill on Island Pond, and filed a condemnation action to flood his neighbors' properties for this purpose. On appeal, this Court held that the mill owner could not use eminent domain to take his neighbors' land because the mill was purely for his personal benefit and because he was not required to serve the public through its operation. Id. at 655-56. The Grices analogize Tyler to their case and ask us to similarly hold that VELCO may not condemn their land because the resulting transmission line will not be subject to state regulation.

¶ 20. We conclude that the Board did not violate the Vermont Constitution in granting VELCO condemnation of the Grice property for construction of the 345kV line. The Constitution allows appropriation of private land when necessary for public use. Vt. Const. Ch. I, Art. 2. As explained in Tyler, to fit this standard the use must benefit the public and be subject to some state control. We do not read Tyler as requiring the public use to

be specifically regulated by state enactment in every aspect of its operation to permit exercise of the power of eminent domain.

¶ 21. This interpretation is consistent with our previous statements defining public use. Following *Tyler*, we explained that public use "appears from the character of the business, and it is safely guarded for the obligation to serve all on equal and reasonable terms, facilities and accommodations." *Rutland Ry., Light & Power Co. v. Clarendon Power Co.*, 86 Vt. 45, 54, 83 A. 332, 335 (1912). Unlike the grist mill in *Tyler*, whose owner had no obligation to serve the public, VELCO is a public-service company authorized to provide energy transmission for the benefit of the public and VELCO has an obligation under its charter to serve the public interest. "[A] corporation which engages in the business of generating and distributing electric energy for general sale for power purposes devotes its property to a public purpose as much as if it limited its business to the sale of current for lighting purposes." *Id.* at 56, 83 A. at 336.

■■ ■■ ¶ 22. The Grices argue that VELCO's transmission services do not directly benefit individual Vermonters and do not benefit all citizens, and that therefore the transmission is not a public use. In defining a public use, we have explained: "It is not necessary to a public use that the whole public or any considerable portion of it participate in it; the use may be, and frequently is, limited to a small locality and yet be public in a constitutional sense." *Deerfield River Co. v. Wilmington Power & Paper Co.*, 83 Vt. 548, 553, 77 A. 862, 864 (1910). The electrical power in the state passes through VELCO's transmission lines. Although VELCO does not retail this power directly to consumers, no electricity could reach Vermonters without passing through VELCO's transmission lines. Thus, we conclude that condemnation of the Grice land is for a public use and does not contravene the Vermont Constitution.

## B.

¶ 23. We next address the Grices' contention that the Board's order is flawed because it does not particularly describe the routes VELCO is authorized to use to access the easement. According to the Grices, their entire 319-acre farm is burdened in perpetuity without a proper finding of necessity and without payment of compensation because VELCO has the right to access

the easement strip at any location. The Grices request that the order be remanded for the Board to describe, condemn and order compensation for specific access routes to the easement. We conclude that the Board adequately described VELCO's rights to access the easement to remove trees and to respond to emergencies.

¶ 24. In a petition for condemnation, a public utility corporation must "describ[e] the property or right" it wishes to condemn. 30 V.S.A. § 111(a). Generally, the interest in land, including the principal right-of-way in the case of an easement, "must be described with certainty and accuracy." *Vt. Elec. Power Co. v. Anderson*, 121 Vt. 72, 78, 147 A.2d 875, 879 (1959). The secondary right-of-access, however, may be "set forth in less precise terms." *Id.* at 78, 147 A.2d at 880. The right-of-access need not be expressly defined or limited because "[t]he creation of an easement or right of way for an electric power line carries with it a reasonable right of access to enable the utility to discharge its legal obligation to render adequate and dependable service." *Id.*

¶ 25. VELCO's proposed easement included a clause granting VELCO the right to enter the Grices' property to cut or trim trees outside the easement area if those trees interfered with the easement area. The proposed easement also granted VELCO the right to enter and cross the Grice property to access the easement without permission in the event of an emergency, but specified that VELCO was responsible for any damage caused by such intrusion. The Grices complained that these clauses were overly broad and instead sought to identify specific access points to the easement. The Board rejected the use of specific access points as impracticable. The Board concluded that the right to enter and cross the Grice property is "critical to all of VELCO's maintenance activities, including structure maintenance, pole testing, tree trimming, brush control, line inspection, and any other work requiring VELCO to access the right of way." The Board found that it was necessary for VELCO to access the land without the landowner's permission to "maintain the reliability and safety of the line."

¶ 26. The Board's finding of necessity is not clearly erroneous. See *In re Vt. Elec. Power Co.*, 131 Vt. 427, 432, 306 A.2d 687, 690 (1973) ("Only when we have reviewed the entire record and have been left with the definite and firm conviction

that a mistake has been committed will we hold a finding to be clearly erroneous."). In addition, VELCO's petition adequately described the easement it sought and the Board did not err in declining to demarcate specific access routes to the easement. As explained in *Anderson*, access routes to an easement need not be described in precise detail. 121 Vt. at 78, 147 A.2d at 880. Here, the clauses strike an appropriate balance between providing VELCO with the broad access that the Board found was necessary, and also protecting the Grices by stipulating that the access will be used only in emergencies and that VELCO will compensate the Grices for any damage caused by this access.

¶ 27. Finally, we are not persuaded by the Grices' contention that VELCO must, as part of the condemnation proceeding, identify and compensate them for any land that will be used as an access route or any tree that will be removed. In support, the Grices cite *Arkansas Power & Light Co. v. Potlatch Forest, Inc.*, wherein the Arkansas Supreme Court held that an electric company had to specifically describe and condemn trees endangering transmission lines and the access routes to the easement. 707 S.W.2d 317, 320 (Ark. 1986). We find this case unconvincing because we apply a different law pertaining to secondary easements than in Arkansas. As described in *Anderson*, we rely on the principle that secondary easements need not be described with particularity — a concept that the court in *Arkansas Power & Light Co.* specifically rejected.

## C.

¶ 28. Finally, we address the Grices' request for attorney's fees and expert-witness costs. The Grices claim they are entitled to attorney's fees because the condemnation action contravenes their constitutional protection that "every person ought to obtain right and justice, freely, and without being obliged to purchase it." Vt. Const. Ch. I, Art. 4.[*] According to the Grices, VELCO's litigation compelled them to "purchase" justice because they had to defend against the condemnation proceeding. The Grices also argue that equity requires an award. We conclude that there is no basis

---

[*] The Grices also cite Articles 7 and 9 of the Vermont Constitution, but do not explain how these provisions entitle them to attorney's fees; therefore, we do not address these arguments. See *Craven v. McCrillis*, 2005 VT 22, ¶ 8, 178 Vt. 476, 868 A.2d 740 (mem.) (declining to address issues that are inadequately briefed).

either in law or in equity to award the Grices attorney's fees or expert-witness costs in this case.

¶ 29. We adhere to the American rule that each party is responsible for its own attorney's fees absent an agreement or a statute authorizing a fee award. *Monahan v. GMAC Mortgage Corp.*, 2005 VT 110, ¶ 76, 179 Vt. 167, 893 A.2d 298. In this case, no statute provides for an award of attorney's fees to the Grices. Although the trial court has discretion under its powers of equity to award attorney's fees, such deviation from the general rule is only justified in exceptional cases. *Id.* ¶¶ 75-76. Equity does not demand an award in this case; there is no evidence that VELCO acted in bad faith to prolong the litigation or forced the Grices to defend multiple actions. See *In re Gadhue*, 149 Vt. 322, 328-30, 544 A.2d 1151, 1154-55 (1987) (granting fees where the plaintiff was forced through defendant's acts to undergo a second round of litigation).

¶ 30. Similarly, there is no constitutional basis to award fees. The right to justice secured by Article 4 is violated if a party is precluded from seeking review of a decision in court. *In re Stoddard*, 144 Vt. 6, 8, 470 A.2d 1185, 1186 (1983). Here, the Grices had full access to the legal system and were not denied access to justice. The Board did not abuse its discretion in declining to award the Grices attorney's fees.

## II.

¶ 31. VELCO's cross-appeal concerns whether it has authority to install excess fiber-optic capacity along the easement. The Board concluded that VELCO needed only twenty-four fiber-optic wires to insure the reliability of the new 345kV line and prohibited VELCO from installing any excess fibers or from trading excess capacity. VELCO argues that the additional fibers are collectively so small that they will not additionally burden the Grices' land and therefore are not a taking. In the alternative, VELCO submits that a seventy-two-wire fiber-optic line is reasonably necessary for the reliable operation of the electrical-transmission system in the state and should be allowed. We conclude that the seventy-two-wire fiber-optic line may be installed as incidental to and consistent with the primary use of providing a reliable electrical-transmission network.

¶ 32. In its condemnation petition, VELCO sought an easement that would allow it to install excess fiber-optic capacity along the

345kV corridor. The Board denied VELCO's request, explaining that VELCO could not use its condemnation authority to take the Grices' property for the purpose of installing telecommunications capacity beyond that necessary for VELCO to provide adequate service. VELCO also argued that the excess capacity was necessary because it would be used to trade and obtain the use of fiber-optic lines in areas of the state where VELCO does not have any capacity and this use was necessary for the maintenance of those other lines. In response, the Board concluded that VELCO could simply purchase lease rights from those companies and therefore trading was not necessary. In its clarification decision, the Board unambiguously concluded that VELCO was authorized to install only twenty-four of the requested seventy-two fibers and could not trade any excess capacity.

¶ 33. We conclude that the Board's interpretation of the statute's requirements is overly strict. The Board's interpretation essentially requires VELCO to demonstrate that every aspect of its plan meets the public necessity and use requirements specific to the improvements implemented at the precise location of the condemned property. We are not persuaded that the statute or the Constitution require this result.

¶ 34. As explained above, the Vermont Constitution limits the appropriation of private land to those instances where the property will be used for a public purpose. This does not mean, however, that the condemning authority must demonstrate how each detail of the project is necessary to serve the public use when those uses are incidental to the public project. Under our public-utility condemnation law, the power to condemn is not invalidated even if an incidental nonpublic purpose may also result from the taking, as long as the substantial and primary purpose remains intact and the incidental benefit "is a mere sequence" of the action. *Lucia v. Vill. of Montpelier*, 60 Vt. 537, 545, 15 A. 321, 325 (1888). In *Lucia*, Montpelier sought to condemn private property to run an additional water-supply line from Berlin Pond. The additional water exceeded the residents' specific water needs, but Montpelier explained that it required the additional capacity in the case of a fire emergency or in case the primary water main failed. The town did not dispute that in the absence of such an emergency the excess water would be used for a different purpose — to create power that could be sold. On review, this Court concluded that Montpelier had authority to condemn property to

transport the additional water based on the primary purpose of perfecting the town's water supply, and any incidental benefit did not invalidate this action. *Id.*

¶ 35. In this case, we similarly conclude that VELCO's primary purpose of installing the OPGW is a public use because it is necessary for maintenance of the line, and the incidental benefit of having excess capacity to lease or trade does not invalidate the public use. Although we do not disagree with the Board's finding that the excess lines are not *necessary* for VELCO's maintenance of its electrical grid because the capacity in other parts of the state could be purchased, there is also no evidence to contradict VELCO's assertion that its purpose in acquiring the excess capacity is to trade for capacity in other areas where VELCO does not have fiber-optic wires. As VELCO explains, the communications capacity it derives will be used to further its public purpose of providing reliable electrical service throughout the state. This incidental benefit derives from and does not interfere with the public use of the line. Thus, the benefit VELCO will accrue from this increased capacity is incidental to and consistent with the line's primary purpose of providing increased capacity and reliability to the electrical-transmission network in the state.

¶ 36. We caution that the doctrine of incidental benefit as it applies to these facts is not a blanket authorization for a condemning authority under our public-utility law to use its power of eminent domain to improperly serve private interests. The benefit is not incidental if the power of eminent domain is "perverted to wrongful ends or diverted to wrongful uses." *Id.*; see *Courchesne v. Town of Weathersfield*, 2003 VT 62, ¶ 12, 175 Vt. 585, 830 A.2d 118 (mem.) (explaining that if a town's action is primarily to serve a public purpose, an incidental private gain does not invalidate the public purpose). The only additional benefit accruing in this case is to the condemnor, VELCO, and is incidental to its statutory authority to condemn land when "necessary" to provide "adequate service to the public in the conduct of its business." 30 V.S.A. § 110. Furthermore, while it is true, as the Grices argue, that no more property may be condemned "than would be necessary to accomplish purely the public component of the project," *State ex rel. Wash. State Convention & Trade Ctr. v. Evans*, 966 P.2d 1252, 1258 (Wash. 1998), we disagree that VELCO is taking more than it would need to accomplish its legitimate propose. As the Board found, VELCO must install an

OPGW in the corridor to maintain the safety and reliability of the network. The only question is whether VELCO can install twenty-four or seventy-two fibers within the wire. Installing seventy-two fibers in the OPGW increases the diameter of the OPGW by a dimension nearly imperceptible to the naked eye, and does not take any more property from the Grices than the OPGW with twenty-four fibers. The increased capacity and ability to trade excess capacity generated from the seventy-two fibers does not expand the taking and imposes no additional burden to the easement and therefore is allowed as an incidental benefit to the public good served as the primary purpose of the condemnation action.

¶ 37. Having concluded that the seventy-two fiber-optic wire is de minimis and may be installed as incidental to the primary purpose of the condemnation action, we do not address VELCO's additional arguments supporting its installation.

*The superior court's judgment is affirmed; the Public Service Board's condemnation order is affirmed, but the order is amended to allow VELCO to install seventy-two fiber-optic wires and to trade excess capacity.*